## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **KIM RYAN,** | : | |
| **Plaintiff,** | : | |
| **vs.** | : | **Case No.:** |
| **ETHICON, INC. and** | : | |
| **JOHNSON & JOHNSON,** | | |
| | : | **JURY TRIAL DEMANDED** |
| **Defendants.** | : | |
| _____ | : | |

## COMPLAINT

COMES NOW Plaintiff Kim Ryan ("Plaintiff"), by and through her attorneys of record, files this her Complaint and for her claims against Defendants Ethicon, Inc. and Johnson & Johnson (collectively hereinafter referred to as "Defendants") states and alleges as follows:

### JURISDICTION AND VENUE

1.      The Court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a) as the amount in controversy exceeds $75,000 and the Plaintiff is a citizen of a different state than one or more of the Defendants.

2.      At all times material hereto, Defendants were engaged in the business of developing, manufacturing, licensing, promoting, marketing, distributing, testing, warranting and/or selling in interstate commerce throughout the United States, including New York, either directly or indirectly, medical devices intended to treat stress urinary incontinence and/or pelvic organ prolapse, including the Ethicon Gynecare TVT SECUR Product (referred herein as the "TVT" or "Pelvic Mesh Product") that was implanted in Plaintiff in New York.

3.      Venue in this district for pretrial proceedings in these civil actions is proper under 28 U.S.C. § 1391, inasmuch as a substantial part of the events or omissions giving rise to the claim

1

occurred in this district. Specifically, Plaintiff was implanted with the product at issue in this district and was injured in this district.

4.     Defendants are subject to in personam jurisdiction in the U.S. District Court for the Southern District of New York because Defendants placed defective products in the stream of commerce and all or some of those products were implanted into and caused personal injuries to Plaintiff, a Florida resident, in the State of New York. Each Defendant has sufficient minimum contacts in New York or otherwise intentionally avails itself of the New York market through, without limitation, its advertisement, promotion, marketing, sales and/or distribution and other business activities, so as to render the exercise of jurisdiction over it by the New York courts consistent with traditional notions of fair play and substantial justice.

## PARTIES

5.     Plaintiff Kim Ryan is a citizen and resident of Sullivan County, New York who was implanted with Defendants' defective medical device at Huntington Hospital in Huntington, New York.

6.     Defendant Johnson & Johnson ("J&J") is a corporation organized and existing under the laws of New Jersey, maintaining its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. J&J organizes its subsidiary businesses into individual Business Units to coordinate the development, manufacture, testing, marketing promotion, training, distribution and sale of its' pelvic floor repair products. Within J&J there are three sectors, medical devices and diagnostics, pharmaceutical, and consumer. Within the medical devices and diagnostic sector are "Business Units" including the "Ethicon Franchise." The Ethicon Franchise was charged by J&J with the design, development, promotion, marketing, testing, training, distribution and sale of the pelvic floor repair products at issue in this case. The companies

2

which comprise the Ethicon Franchise are thus controlled by J&J and include, but are not limited to, Ethicon Inc., Ethicon LLC, Ethicon LTD. J&J is a citizen of New Jersey.

7.      Defendant Ethicon, Inc., is a wholly owned subsidiary of Defendant J&J and located in Somerville, New Jersey. Ethicon, Inc. is a corporation organized and existing under New Jersey law, maintaining its principal place of business at 1000 US Hwy, 202 S, in Raritan, New Jersey. Ethicon, Inc. is a citizen of New Jersey.

8.      J&J is liable for any acts and/or omissions by or through Ethicon, Inc. Ethicon, Inc. is organized and controlled, and its business is conducted in such a manner as to make it merely an agent, alter ego, or business conduit of J&J. J&J has not dealt with Ethicon, Inc. at arms-length but instead has dominated and controlled Ethicon, Inc.'s activities, policies, and decisions. For example, J&J has made the decision to restructure the Medical Devices business segment to which the Ethicon business unit belongs as a streamlining and cost-savings measure. J&J's restructuring of the Medical Devices business segment resulted in a decrease or discontinuation of investment and research and development with respect to pelvic mesh and other surgical mesh devices and elimination of a sizeable portion of the workforce within the Medical Devices business segment, including many at Ethicon, Inc.

9.      Defendants are individually, jointly, and severally liable to Plaintiff for damages suffered by Plaintiff arising from the Defendants' design, manufacture marketing, labeling, distribution, and sale of their TVT product at issue in the instant suit, effectuated directly and indirectly though their respective agents.

10.     Defendants are vicariously liable for the acts and omissions of their employees and/or agents who were at all times relevant hereto acting on behalf of Defendants and within the scope of their employment or agency with Defendants.

11.     At all times relevant herein, Defendants were engaged in the business of placing medical devices into the stream of commerce by designing, manufacturing, testing, training, marketing, promoting, packaging, labeling, and /or selling such devices, including the TVT. Defendants manufacture, market, advertise, promote, and sell products worldwide.

12.     J&J and Ethicon, Inc. are collectively referred to herein as "Ethicon" or "Defendants."

## FACTUAL BACKGROUND

13.     At all times relevant herein, Defendants were engaged in the business of placing medical devices into the stream of commerce by designing, manufacturing, marketing, packaging, labeling, and selling such devices, including the Pelvic Mesh Product. The Pelvic Mesh Product is a product targeted at women who suffer from stress urinary incontinence as a result of weakening or damage to the walls of the vagina. The Pelvic Mesh Product is represented by Defendants to correct and restore normal urethral structure by implantation of polypropylene mesh in the vaginal wall tethered in place. It is specifically promoted to physicians and patients as an innovative, minimally invasive procedure with minimal local tissue reactions, minimal tissue trauma, and minimal pain while correcting stress urinary incontinence.

14.     Prior the implantation of the Pelvic Mesh Product at issue in this claim, Defendants sought and obtained Food and Drug Administration ("FDA") approval to market the Pelvic Mesh Product under Section 50(k) of the Medical Device Amendment to the Food, Drug and Cosmetics Act. Section 510(k) allows marketing of medical devices if the device is deemed substantially equivalent to other legally marketed predicate devices marketed prior to May 28, 1976. No formal review for safety or efficacy is required.

15.    Despite claims that the monofilament polypropylene mesh in the Pelvic Mesh Product is inert, the scientific evidence shows that this material is biologically incompatible with human tissue and promotes an immune response. This immune response promotes degradation of the pelvic tissue and can contribute to the formation of severe adverse reactions to the mesh.

16.    The Pelvic Mesh Product has been marketed to the medical community and to patients as safe, effective, and reliable medical devices that can be implanted by safe, effective, and minimally invasive surgical techniques.

17.    Defendants marketed and sold the Pelvic Mesh Product through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies included, but are not limited to, aggressive marketing and the provision of valuable cash and non-cash benefits to healthcare providers. Defendants also utilized documents, patient brochures, and websites, offering exaggerated and misleading expectations as to the safety and utility of this product.

18.    Contrary to the representations and marketing of Defendants, the Pelvic Mesh Product has high failure, injury, and complication rates, fails to perform as intended, requires frequent and often debilitating revision surgeries, and has caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff. The defects stem from many issues, including:

    a.    the use of polypropylene material in the Pelvic Mesh Product and the immune reaction that results;

    b.    the design of the Pelvic Mesh Product to be inserted transvaginally into an area of the body with high levels of pathogens that adhere to the mesh, which can cause immune reactions and subsequent tissue breakdown;

    c.    the contraction or shrinkage of the mesh;

5

d.      biomechanical issues with the design of the mesh that create strong amounts of friction between the mesh and the underlying tissue that subsequently causes that tissue to degrade;

e.      the use and design of anchors in the Pelvic Mesh Product that when placed correctly are likely to pass through and injure major nerve routes in the pelvic region;

f.      degradation of the mesh itself over time which causes the internal tissue to degrade;

g.      the welding of the mesh itself during production, which creates a toxic substance that contributes to the degradation of the mesh and host tissue; and

h.      the design of the trocars and/or insertion implements (devices used to insert the Pelvic Mesh Product into the vagina) requires tissue penetration in nerve-rich environments, which results frequently in the destruction of nerve endings.

19.     Upon information and belief, Defendants have consistently underreported and withheld information about the propensity of their Pelvic Mesh Product to fail and cause injury and complications, and have misrepresented the efficacy and safety of this product, through various means and media, actively and intentionally misleading the public.

20.     Despite the chronic underreporting of adverse events associated with the Pelvic Mesh Product, enough complaints were recorded for the Food and Drug Administration ("FDA") to issue a public health notification regarding the dangers of this device.

21.     On October 20, 2008, the FDA issued a Public Health Notification that described over a thousand (1,000) complaints (otherwise known as "adverse events") that had been reported over a three-year period relating to the Pelvic Mesh Product and other similar products. Although the FDA notice did not identify the transvaginal mesh manufacturers by name, a review of the FDA's MAUDE database indicates that Defendants are some of the manufacturers of the products that are the subject of the notification.

22.     On July 13, 2011, the FDA issued a Safety Communication entitled, "UPDATE on Serious Complications Associated with Transvaginal Placement of Surgical Mesh for Pelvic Organ Prolapse." Therein, the FDA advised that it had conducted an updated analysis of adverse events reported to the FDA and complications reported in the scientific literature and concluded that surgical mesh used in transvaginal repair of pelvic organ prolapse was an area of "continuing serious concern" (emphasis added). The FDA concluded that serious complications associated with surgical mesh for transvaginal repair of pelvic organ prolapse were "not rare." These serious complications include, but are not limited to, neuromuscular problems, vaginal scarring/shrinkage, and emotional problems. Many of the serious complications required medical and surgical treatment and hospitalization. The FDA concluded that it was not clear that transvaginal repair of pelvic organ prolapse and stress urinary incontinence with mesh kits was more effective than traditional non-mesh repair of these conditions. The FDA conducted a systematic review of the published scientific literature from 1996 to 2011 and concluded that transvaginal pelvic organ prolapse repair with mesh "does not improve symptomatic results or quality of life over traditional non mesh repair." In the July 13, 2011 Safety Communication, the FDA concluded that "a mesh procedure may put the patient at risk for requiring additional surgery or for the development of new complications. Removal of the mesh due to mesh complications may involve multiple

surgeries and significantly impair the patient's quality of life. Complete removal of mesh may not be possible." The information contained in the FDA's Public Health Notification of October 2008 and the FDA Safety Communication of July 13, 2011, was known or knowable to Defendants and was not disclosed in any manner.

23.     Following the FDA's Safety Announcement, the FDA required post-marketing studies on the TVT-SECUR device.  Defendants did not following through with those ordered studies, and, instead, withdrew the device.

24.     Defendants have further known the following:

a.     that some of the predicate devices for the Pelvic Mesh Product had high failure and complication rates, resulting in the recall of some of these predicate devices;

b.     that there were and are significant differences between the Pelvic Mesh Product and some or all of the predicate devices, rendering them unsuitable for designation as predicate devices;

c.     that these significant differences render the disclosures to the FDA incomplete and misleading; and

d.     that the Pelvic Mesh Product was and is causing numerous patients severe injuries and complications.

25.     Defendants suppressed this information and failed to accurately and completely disseminate or share this and other critical information with others, including Plaintiff. As a result, Defendants actively and intentionally misled and continue to mislead the public into believing that the Pelvic Mesh Product and the procedures for implantation were and are safe and effective.

26.     Defendants failed to perform or rely on proper and adequate testing and research in order to determine and evaluate the risks and benefits of the Pelvic Mesh Product.

27.     Defendants failed to design and establish a safe, effective procedure for removal of the Pelvic Mesh Product; thus, in the event of a failure, injury, or complications, it is impossible to easily and safely remove the Pelvic Mesh Product.

28.     Feasible and suitable alternative designs as well as suitable alternative procedures and instruments for repair of stress urinary incontinence have existed at all times relevant to this matter that would have eliminated the risks of Defendants' polypropylene mesh to Plaintiff and to other women like Plaintiff. Safer alternatives may include, for example: a retropubic sling, the Burch or similar procedure; an autologous fascial or allograft sling, such as Repliform; a sling of lighter weight, larger pore mesh, such as Vypro or Ultrapro; or a sling made of polyethylene or PVDF.

29.     The Pelvic Mesh Product was at all times utilized and implanted in a manner foreseeable to Defendants, as they generated the instructions for use, created the procedures for implanting the device, and trained the implanting physicians.

30.     Defendants provided incomplete, insufficient, and misleading training and information to physicians to increase the number of physicians utilizing the Pelvic Mesh Product, and thus increase the sales of this product.

31.     The Pelvic Mesh Product implanted into Plaintiff was in the same or substantially similar condition as it was when it left the possession of Defendants, as well as being in the condition directed by and expected by these Defendants.

32.     Plaintiff Kim Ryan and her physician foreseeably used and implanted the Pelvic Mesh Product, and did not misuse or alter this product in an unforeseeable manner.

33.    The injuries, conditions, and complications suffered by women who have been implanted with the Pelvic Mesh Product include, but are not limited to, mesh erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, blood loss, acute and chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, chronic pelvic pain, urinary and fecal incontinence, and prolapse of organs. In many cases, these women have been forced to undergo intensive medical treatment, including, but not limited to, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and surgeries to remove portions of the female genitalia, to locate and remove mesh, and to attempt to repair pelvic organs, tissue, and nerve damage.

34.    The medical and scientific literature studying the effects of polypropylene pelvic mesh (like the material used in the Pelvic Mesh Product) have examined each of these injuries, conditions, and complications and determined that they are in fact casually related to the mesh itself and do not often implicate errors related to the implantation of the device.

35.    Defendants knew and had reason to know that the Pelvic Mesh Product could and would cause severe and grievous personal injury to the users of the Pelvic Mesh Product, and that it was inherently dangerous in a manner that exceeded any purported, inaccurate, or otherwise downplayed warnings.

36.    At all relevant times herein, Defendants continued to promote the Pelvic Mesh Product as safe and effective even when no clinical trials had been done supporting long or short-term efficacy.

37.    At all relevant times herein, Defendants failed to provide sufficient warnings and instructions that would have put the Plaintiff and the public on notice of the dangers and adverse effects caused by implantation of the Pelvic Mesh Product.

38.    The Pelvic Mesh Product was defective as marketed due to inadequate warnings, instructions, labeling, and/or inadequate testing.

### FACTS SPECIFIC TO PLAINTIFF KIM RYAN

39.    On or about August 19, 2011, Plaintiff underwent surgery to address her stress urinary incontinence at Huntington Hospital in Huntington, New York, with John Wagner, M.D. During this surgery she was implanted with Defendants' TVT Secur, identified as follows:



40.    The TVT implanted in Plaintiff was in the same or substantially similar condition as it was when it left Defendants' possession, and in the condition directed by and expected by Defendants. Plaintiff's treating physician implanted the TVT properly and appropriately. Plaintiff's surgery was performed without intraoperative complications.

41.    As a result of having the TVT implanted in her, Plaintiff has experienced significant mental and physical pain and suffering including but not limited to mesh exposure into the urethra, mesh erosion, mesh protrusion, chronic and severe pelvic pain, has sustained permanent injury, permanent and substantial physical deformity, has undergone and likely will undergo further corrective surgery or surgeries, and has suffered financial or economic loss, including, but not limited to obligations for medical services and expenses.

42.    Specifically, in May of 2023, Plaintiff experienced urethral mesh erosion. Plaintiff began experiencing pelvic pain that began earlier in 2023 prior to this event.

43.    On September 1, 2023, Plaintiff underwent an excision of the suburethral exposed sling at Garnet Health Medical Center in Middletown, New York by Michael E. Hoffman, M.D. During this procedure, the sling was found to be exposed and protruding and a 5-inch segment of the sling was removed.

44.    In the months leading up to and following this September, 2023 surgery, Plaintiff suffered severe pelvic and vaginal pain.

45.    As a result of the implantation of Defendants' TVT, and the surgeries required to remove the mesh from her body, Plaintiff has suffered from numerous mesh-related injuries including significant and chronic pelvic pain, vaginal pain, worsening issues with incontinence, further urinary problems, permanent scarring, and will continue to endure pain and suffering for the rest of her life as a direct and proximate result of having had Defendants' defective TVT device implanted in her body. Additionally, portions of the TVT device remain implanted, and thus, Plaintiff suffers from a lifetime risk of further chronic inflammation, persistent erosion, further mesh degradation and need for additional surgeries.

46.    Plaintiff has retained legal counsel and will incur legal fees and expenses in pursuing her claims in this civil action against Defendants.

### COUNT I: STRICT LIABILITY – FAILURE TO WARN

47.    Plaintiff repeats and re-alleges the paragraphs above as if specifically set forth herein and additionally or in the alternative, if necessary, further alleges as follows:

48.    Defendants designed, researched, developed, manufactured, tested, labeled, advertised, promoted, marketed, sold, supplied, and/or distributed the Pelvic Mesh Product at issue herein.

49.    The Pelvic Mesh Product at issue herein was expected to, and did, reach the intended consumers, handlers, and persons receiving the product, including Plaintiff, with no

substantial change in the condition in which the product was designed, produced, manufactured, sold, distributed, labeled and marketed by Defendants.

50.    The Pelvic Mesh Product at issue herein was manufactured, designed, marketed, labeled and sold in a defective condition, for use by the Plaintiff's physicians and/or healthcare providers and all other consumers of the product, making the product unreasonably dangerous.

51.    The Pelvic Mesh Product at issue herein implanted in Plaintiff was not reasonably safe for its intended use and was defective as described herein as a matter of law due to its lack of appropriate and necessary warnings.   Specifically, Defendants did not provide sufficient or adequate warnings regarding, among other subjects:

    a.    The propensities of the Pelvic Mesh Product at issue herein to contract, retract, and/or shrink inside the body;

    b.    The propensities of the Pelvic Mesh Product at issue herein for degradation, fragmentation, disintegration and/or creep;

    c.    The inelasticity of the Pelvic Mesh Product at issue preventing proper mating with the pelvic floor and vaginal region;

    d.    The rate and manner of mesh erosion or extrusion;

    e.    The risk of chronic inflammation resulting from the Pelvic Mesh Product at issue herein;

    f.    The risk of chronic infections resulting from the Pelvic Mesh Product at issue herein;

    g.    The risk of permanent vaginal or pelvic scarring as a result of the Pelvic Mesh Product at issue herein;

h.   The risk of recurrent, intractable pelvic pain and other pain resulting from the Pelvic Mesh Product at issue herein;

i.   The need for corrective or revision surgery to adjust or remove the Pelvic Mesh Product at issue herein;

j.   The severity of complications that could arise as a result of implantation of the Pelvic Mesh Product at issue herein, including permanent nerve damage;

k.   The hazards associated with the Pelvic Mesh Product at issue herein;

l.   The defects of the Pelvic Mesh Product at issue as described herein;

m.   Treatment of stress urinary incontinence with the TVT is no more effective than feasible available alternatives;

n.   Treatment of stress urinary incontinence with the TVT exposes patients to greater risk than feasible available alternatives;

o.   Treatment of stress urinary incontinence with the TVT makes future surgical repair more difficult than feasible available alternatives;

p.   Use of the Pelvic Mesh Product at issue herein puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

q.   Removal of the Pelvic Mesh Product at issue herein due to complications may involve multiple surgeries and may significantly impair the patient's quality of life and intimate personal relationships;

r.   Complete removal of the Pelvic Mesh Product at issue herein may not be possible and may not result in complete resolution of the complications, including pain; and

s.      The nature, magnitude and frequency of complications that could arise as a

result of implantation of the Pelvic Mesh Product at issue herein.

52.     Defendants, by exercising reasonable diligence, could have made such warnings

available to Plaintiff, Plaintiff's healthcare providers, and the medical community.

53.     As a direct and proximate result of Defendants' failure to provide Plaintiff,

Plaintiff's healthcare providers, and the medical community with sufficient or adequate warnings,

Plaintiff and Plaintiff's healthcare providers were not adequately informed of the potential dangers

and/or defects of the Pelvic Mesh Products at issue herein.

54.     As a direct and proximate result of the Pelvic Mesh Product's inadequate warnings,

Plaintiff suffered severe physical injuries, pain and suffering, and economic damages for which

she now seeks compensation.

55.     WHEREFORE, Plaintiff demands judgment against Defendants for compensatory

damages, for punitive damages, and for costs in excess of $75,000 and such other relief as this

Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT II: STRICT LIABILITY – DEFECTIVE DESIGN

56.     Plaintiff repeats and re-alleges the paragraphs above as if specifically set forth

herein and additionally or in the alternative, if necessary, further alleges as follows:

57.     The pelvic mesh product at issue herein, the TVT device, was designed, marketed,

manufactured and distributed by Defendants and was defective and not reasonably safe due to their

improper, inadequate, and defective design.

58.     Defendants designed, researched, developed, manufactured, tested, labeled,

advertised, promoted, marketed, sold, supplied, and/or distributed the Pelvic Mesh Product at issue

herein and Plaintiff was an expected user or consumer of the mesh product.

59.     The pelvic mesh product at issue herein that was implanted in Plaintiff was conveyed in a condition not contemplated by reasonable persons among those considered expected users or consumers of the pelvic mesh product, like Plaintiff.

60.     The pelvic mesh product at issue herein that was implanted in Plaintiff was, at the time conveyed, in a defective condition and unreasonably dangerous. At the time, there were also several feasible and safer alternative designs for the device.

61.     The pelvic mesh product at issue herein that was implanted in Plaintiff was not reasonably safe for its intended use and was defective as described herein with respect to its design. As previously stated, the design defects of the product include, but are not limited to:

    a.    The design of the device as a "single insert mini-sling" was dangerous, as it caused and unreasonable risk of migration, failure to append to tissues, and unreasonable risk of a foreign body rejection response, especially as compared to feasible safer alternative designs;

    b.    The use of polypropylene in the Pelvic Mesh Product at issue herein and the immune reaction that results from such material, causing adverse reactions and injuries;

    c.    The design of the Pelvic Mesh Product at issue herein to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

    d.    Biomechanical issues with the design of the Pelvic Mesh Product at issue herein, including, but not limited to, the propensity of the Pelvic Mesh Product at issue herein to contract or shrink inside the body, that in turn

16

cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

e. The use and design of arms and anchors in the Pelvic Mesh Product at issue herein, which, when placed in women, such as Plaintiff, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region;

f. The propensity of the Pelvic Mesh Product at issue herein for "creep," or to gradually elongate and deform when subjected to prolonged tension inside the body;

g. The inelasticity of the Pelvic Mesh Product at issue herein, causing the product to be improperly mated to the delicate and sensitive areas of the pelvis where it is implanted, and causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse and defecation);

h. The propensity of the Pelvic Mesh Product at issue herein for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time;

i. The hyper-inflammatory responses to collagen leading to problems including chronic pain and fibrotic reaction;

j. The propensity of the product to disintegrate after implantation in the female pelvis, causing pain and other adverse reactions;

k. The hardening of the Pelvic Mesh Product at issue herein in the body;

l.    The creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanting according to the manufacturers' instructions, and

m.    The use of polypropylene material in the Pelvic Mesh Product at issue herein and the failure to provide adequate directions for use ("DFU") or instructions for use ("IFU") and training.

62.    As a direct and proximate result of the defective design of the Pelvic Mesh Product, Plaintiff suffered severe physical injuries, pain and suffering, and economic damages for which she now seeks compensation.

63.    WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, for punitive damages, and for costs in excess of $75,000 and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT III: NEGLIGENCE

64.    Plaintiff repeats and re-alleges the paragraphs above as if specifically set forth herein and additionally or in the alternative, if same be necessary, further alleges as follows:

65.    Defendants had a duty to exercise reasonable case in the design, research, manufacture, marketing, testing, advertisement, supply, promotion, packaging, sale, and distribution of the Pelvic Mesh Product at issue herein, including the duty to take all reasonable steps necessary to manufacture and sell products that were not defective or unreasonably dangerous to consumers and users of the products, including Plaintiff herein. Defendants were negligent in failing to use reasonable care as described herein in designing, manufacturing, marketing, labeling, packaging and selling the Pelvic Mesh Product at issue herein. Defendants breached the aforementioned duty by, among other things:

18

a.   Failing to design the Pelvic Mesh Product at issue herein so as to avoid an unreasonable risk of harm to women in whom the Pelvic Mesh Product at issue herein was implanted, including Plaintiff;

b.   Failing to manufacture the Pelvic Mesh Product at issue herein so as to avoid an unreasonable risk of harm to women in whom the Pelvic Mesh Product at issue herein were implanted, including Plaintiff;

c.   Failing to use reasonable care in the testing of the Pelvic Mesh Product at issue herein so as to avoid an unreasonable risk of harm to women in whom the Pelvic Mesh Product at issue herein was implanted, including Plaintiff;

d.   Failing to use reasonable care in inspecting the Pelvic Mesh Product at issue herein so as to avoid an unreasonable risk of harm to women in whom the Pelvic Mesh Product at issue herein was implanted, including Plaintiff;

e.   Failing to use reasonable care in the training and instruction to physicians for the safe use of the Pelvic Mesh Product at issue herein;

f.   Failing to use reasonable care in studying the Pelvic Mesh Product at issue herein to evaluate its safety and to determine the nature, magnitude, and frequency of serious, life threatening complications that were known or knowable; and

g.   Otherwise negligently or carelessly designing, manufacturing, marketing, labeling, packaging and/or selling the Pelvic Mesh Product at issue herein.

66.   The reasons that Defendants' negligence caused the Pelvic Mesh Product at issue herein to be unreasonably dangerous and defective include, but are not limited to:

a.    The use of polypropylene material in the Pelvic Mesh Product at issue herein and the immune reaction that results from such material, causing adverse reactions and injuries;

b.    The design of the Pelvic Mesh Product at issue herein to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c.    Biomechanical issues with the design of the Pelvic Mesh Product at issue herein, including, but not limited to, the propensity of the Pelvic Mesh Product at issue herein to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

d.    The use and design of arms and anchors in the Pelvic Mesh Product at issue herein, which, when placed in women, such as Plaintiff, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region;

e.    The propensity of the Pelvic Mesh Product at issue herein for "creep," or to gradually elongate and deform when subjected to prolonged tension inside the body;

f.    The inelasticity of the Pelvic Mesh Product at issue herein, causing it to be improperly mated to the delicate and sensitive areas of the pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation);

20

g.    The propensity of the Pelvic Mesh Product at issue herein for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time;

h.    The hyper-inflammatory responses to collagen leading to problems including chronic pain and fibrotic reaction;

i.    The propensity of the collagen products to disintegrate after implantation in the female pelvis, causing pain and other adverse reactions;

j.    The adverse tissue reactions caused by the products, which are causally related to infection, as the polypropylene is a foreign material; and

k.    The creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanted according to the manufacturers' instructions.

67.    Defendants also negligently failed to warn or instruct Plaintiff and/or her health care providers of subjects including, but not limited to, the following:

a.    The Pelvic Mesh Product's propensities to contract, retract, and/or shrink inside the body;

b.    The Pelvic Mesh Product's propensities for degradation, fragmentation and/or creep;

c.    The Pelvic Mesh Product's inelasticity preventing proper mating with the pelvic floor and vaginal region;

d.    The rate and manner of mesh erosion or extrusion;

e.    The risk of chronic inflammation resulting from the Pelvic Mesh Product at issue herein;

f.     The risk of chronic infections resulting from the Pelvic Mesh Product at issue herein;

g.     The risk of permanent vaginal or pelvic scarring as a result of the Pelvic Mesh Product at issue herein;

h.     The risk of recurrent, intractable pelvic pain and other pain resulting from the Pelvic Mesh Product at issue herein;

i.     The need for corrective or revision surgery to adjust or remove the Pelvic Mesh Product at issue herein;

j.     The severity of complications that could arise as a result of implantation of the Pelvic Mesh Product at issue herein including permanent nerve damage;

k.     The hazards associated with the Pelvic Mesh Product at issue herein;

l.     The Pelvic Mesh Product's defects described herein;

m.     Treatment of stress urinary incontinence with the Pelvic Mesh Product at issue herein is no more effective than feasible available alternatives;

n.     Treatment of stress urinary incontinence with the Pelvic Mesh Product at issue herein exposes patients to greater risk than feasible available alternatives;

o.     Treatment of stress urinary incontinence with the Pelvic Mesh Product at issue herein makes future surgical repair more difficult than feasible available alternatives;

p.     Use of the Pelvic Mesh Product at issue herein puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

q.   Removal of the Pelvic Mesh Product at issue herein due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

r.   Complete removal of the Pelvic Mesh Product at issue herein may not be possible and may not result in complete resolution of the complications, including pain.

68.   As a direct and proximate result of the wrongful acts and omissions of Defendants, Plaintiff suffered severe physical injuries, pain and suffering, and economic damages for which she now seeks compensation.

69.   WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, for punitive damages, and for costs in excess of $75,000 and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT IV: NEGLIGENT MISREPRESENTATION

70.   Plaintiff repeats and re-alleges the paragraphs above as if specifically set forth herein and additionally or in the alternative, if necessary, further alleges as follows:

71.   Defendants, from the time that the Pelvic Mesh Product were first tested, studied, researched, first manufactured, marketed and distributed, and up to the present, made false representations, as previously set forth herein, to the Plaintiff, her prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, and the public in general, including, but not limited to, the misrepresentation that the Pelvic Mesh Product was safe, fit, and effective for the treatment of stress urinary incontinence.

72.   Defendants owed a duty to Plaintiff, her prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, and the public in general, to accurately and truthfully represent the risks of the Pelvic Mesh Product. Defendants

23

breached that duty by misrepresenting and/or failing to adequately warn Plaintiff, her prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, and the public in general about the risks of the Pelvic Mesh Product, which Defendants knew or in the exercise of reasonable diligence should have known.

73.     The foregoing representations by Defendants were in fact false in that the Pelvic Mesh Product is not, and at all relevant times alleged herein, was not safe, fit, and effective for the treatment of stress urinary incontinence, the use of the Pelvic Mesh Product is hazardous to health, and the Pelvic Mesh Product has a significant propensity to cause serious injuries to users including, but not limited to, the injuries suffered as described herein by Plaintiff. The foregoing misrepresentations by Defendants were made with the intention of inducing reliance and inducing the purchase and implantation of Pelvic Mesh Product.

74.     In reliance on the misrepresentations of Defendants, Plaintiff and her prescribing physicians and healthcare providers were induced to purchase and use the Pelvic Mesh Product. If they had known of the true facts and the facts misrepresented by Defendants, they would not have used the Pelvic Mesh Product, and their reliance upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

75.     As a direct and proximate result of the wrongful acts and omissions of Defendants, Plaintiff suffered severe physical injuries, pain and suffering, and economic damages for which she now seeks compensation.

76.     WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, for punitive damages, and for costs in excess of $75,000 and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## BASES FOR PUNITIVE DAMAGES

77.    Plaintiff is entitled to an award of punitive and exemplary damages based upon Defendants' intentional, willful, knowing, fraudulent, malicious acts, omissions, gross negligence, wanton and reckless conduct, and their complete and total reckless disregard for the public safety and welfare.

78.    Defendants had knowledge of or should have had knowledge of, and/or were in possession of evidence demonstrating that the Pelvic Mesh Product at issue was defective and unreasonably dangerous and/or was an inappropriate choice for treatment of Plaintiff's SUI. Despite this knowledge, Defendants failed to, among other purposeful acts, inform or warn of the dangers, establish and maintain an adequate quality and post-market or post-implant surveillance system, and/or recall the Pelvic Mesh Product.

79.    Defendants sold the Pelvic Mesh Product to the healthcare providers of the Plaintiff and other healthcare providers in the state of implantation and throughout the United States without doing adequate testing to ensure that the Product were reasonably safe for implantation in the female pelvic area.  Defendants knew adequate testing was required to substantiate their claims of safety and efficacy, yet consciously and deliberately decided to forego sufficient testing.

80.    Defendants sold the Pelvic Mesh Product to the Plaintiff's healthcare providers and other healthcare providers in the state of implantation and throughout the United States in spite of their knowledge that the Product can shrink, disintegrate and/or degrade inside the body, and cause the other problems heretofore to set forth in this Complaint, thereby causing severe and debilitating injuries suffered by the Plaintiff and numerous other women.

81.    Defendants deliberately ignored reports from patients and healthcare providers throughout the United States and elsewhere of the Pelvic Mesh Product's failures to perform as intended, which lead to the severe and debilitating injuries suffered by the Plaintiff and numerous

other women. Rather than doing adequate testing to determine the cause of these injuries, or to rule out the Product's designs, or the processes by which the Pelvic Mesh Product is manufactured as the cause of these injuries, Defendants chose instead to continue to market and sell the Pelvic Mesh Product as safe and effective.

82.    Defendants intentionally withheld material safety and adverse risk information from the medical community and the public in general, including the Plaintiff, regarding the safety and lack of efficacy of the Pelvic Mesh Product.

83.    Notwithstanding the foregoing, Defendants continue to aggressively market the Pelvic Mesh Product to consumers, without disclosing the true risks associated with the Pelvic Mesh Product.

84.    Defendants deliberately and actively concealed and failed to disclose to the public, including the Plaintiff and her physicians, the serious complications associated with the use of the Product to ensure continued and increased sales of the Product.

85.    Defendants' conduct as described herein shows willful misconduct, malice, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment jointly and severally against the Defendants and for all causes of action alleged above and requests damages in excess of $75,000.  Plaintiff demands judgement against Defendants and requests relief in the form of compensatory damages, together with interest, cost of suit, attorneys' fees, and all such other relief as the Court deems just and proper as well as:

a)    Compensatory damages to Plaintiff for past, present, and future damages, including, but not limited to, pain and suffering for severe and permanent

personal injuries sustained by Plaintiff, health and medical care costs, together with interest and costs as provided by law;

b) Reasonable attorneys' fees;

c) Costs of these proceedings;

d) All ascertainable economic damages;

e) Punitive Damages; and

f) Such other and further relief as this Court deems just and proper.

## PLAINTIFF DEMANDS A TRIAL BY JURY

Dated: July 10, 2025

Respectfully submitted,

 /s/ *Kevin M. Berry*

**Kevin M. Berry**
**NY Registration No. 2044857**
**WILENTZ, GOLDMAN &**
**SPRITZER, PA**
14 Wall Street, Suite 6N
New York, NY 10005
kberry@wilentz.com
Ph: (855) 945-3689
Fax: (732) 726-6672
**Robert E. Price**
(*pro hac vice* application pending)
**FL Bar No. 85284**
**KETTERER BROWNE &**
**DAVINI, LLC**
4300 Bayou Blvd., Ste. 16, Fl. 2
Pensacola, FL 32503
robert@kbaattorneys.com
Ph: (850) 805-7011
Fax: (850) 801-3190

*Counsel for Plaintiff*